UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

JAMES DONAVAN,

                                   Plaintiff,                    Case No. 1:16-CV-0924 (LEK/DJS)

           - v –                                                **COMPLAINT**

SAINT-GOBAIN PERFORMANCE PLASTICS
CORP., and HONEYWELL INTERNATIONAL                               **DEMAND FOR JURY TRIAL**
INC. f/k/a ALLIED-SIGNAL INC.,

                                   Defendants
------------------------------------------------------------------x

Plaintiff, by and through his attorneys, as and for his complaint against Defendants, allege as follows:

## INTRODUCTION

1.      The residents of Hoosick Falls, New York receive their drinking water from groundwater.  Although unknown to them, for years they have been drinking water laced with a dangerous chemical called perfluorooctanoic acid, commonly referred to as PFOA.  When consumed, PFOA can cause numerous and serious health issues.

2.      The defendants have contaminated the local aquifer with this chemical, which has resulted in a significant number of individuals, including plaintiff Mr. Donovan, suffering from severe impairments of their health.

3.      On May 19, 2016, the U.S. Environmental Protection Agency issued a new health advisory for PFOA (and a related chemical, PFOS), setting lifetime exposure to PFOA and PFOS

from drinking water at 70 parts per trillion (ppt).  Upon information and belief, the level of PFOA in Hoosick Falls' municipal water supply has exceeded 500 ppt for years, if not decades.

4.      The State of New York has identified Saint-Gobain Performance Plastics Corp. (Saint-Gobain) and Allied Signal Inc., now doing business as Honeywell International Inc. (Allied-Signal), as two of the parties, if not the only parties, potentially responsible for the contamination of the groundwater in Hoosick Falls.  Collectively, Saint-Gobain and Allied-Signal are referred to throughout this complaint as "Defendants."

5.      Defendants, in whole or in part, contaminated the aquifer beneath Hoosick Falls with PFOA.

6.      On January 27, 2016, Governor Cuomo directed New York state agencies to use Superfund money to address PFOA in the Hoosick Falls' water system and in private wells.  The primary Saint-Gobain site in Hoosick Falls was declared, at that time, a State Superfund site. The State has since described the site as a "significant threat to public health or the environment."

7.      The PFOA contamination within the local water supply has had a direct and adverse health impact on plaintiff James "Jed" Donavan.

**PARTIES**

8.      Plaintiff Donavan is a citizen and resident of the Town of Hoosick Falls, New York.

9.      Defendant Saint-Gobain Performance Plastics Corporation is a foreign company with its principal executive office located at 750 East Swedesford Road, Valley Forge, Pennsylvania.

10.     Saint-Gobain is a Paris-based multinational corporation with more than 350 years of engineered materials expertise.  Saint-Gobain is one of the 100 largest industrial companies in the world with € 43.2 billion in sales and 193,000 employees in 64 countries.  Saint-Gobain employs approximately 1,200 people in New York.

11.     Saint-Gobain is the world's leading producer of engineered, high-performance polymer products, serving virtually every major industry across the globe.  Saint-Gobain businesses support these key industries in bringing advanced technology polymer products and using them in the most demanding applications.

12.     Defendant Honeywell International (Honeywell), f/k/a Allied-Signal Inc., is a foreign corporation with its principle executive office located at 115 Tabor Road, Morris Plains, New Jersey.

13.     Honeywell is a Fortune 100 company with a global workforce of approximately 130,000. It serves a variety of industries, including the specialty chemicals industry.

14.     In 1999, Allied-Signal Inc. acquired Honeywell.  The combined companies adopted Honeywell's name, however, because of superior name recognition.

15.     Allied-Signal was an aerospace, automotive, and engineering company that was created through the 1985 merger of Allied Corp. and Signal Companies.  Together, these companies have operated in the United States since at least the early 1920s.  Prior to the merger, a significant portion of Allied Corp.'s business was concerned with the chemical industry.

16.     Defendants, at various times relevant herein, and as described more fully below, operated a manufacturing facility at or around, *inter alia*, 14 McCaffrey Street, Hoosick Falls, New York.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court due to diversity of citizenship, pursuant to 28 U.S.C. § 1332(a), because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendant Saint-Gobain conducts substantial business in this District, has caused harm to the plaintiff, who resides in this District.

## GENERAL FACTUAL ALLEGATIONS

**Background Regarding PFOA**

19.     PFOA is a man-made chemical not found in nature.

20.     Minnesota Mining and Manufacturing Company (3M) is the original manufacturer of PFOA.

21.     Several other companies have manufactured PFOA within the United States. Those companies include Arkema, Asahi, BASF Corp., Clariant, Daikin, DuPont and Solvay Solexis.

22.     PFOA is a perfluoralkyl carboxylate that is produced synthetically as a salt.

23.     Companies utilized PFOA for a number of uses; indeed, it was a key component in the manufacturing of Teflon.

24.     Companies also used PFOA to make fabrics water and stain resistant.

25.     For example, PFOA was used in the production of Gore-Tex.

26.     PFOA has been identified as an emerging contaminant of concern.

27.     The New York State Department of Health Commissioner has requested that the State list PFOA as a "hazardous substance" under New York law.

28.     There are a number of health risks associated with chronic exposure to PFOA, and these risks are present even when PFOA is ingested at, seemingly, very low levels (less than 1.0 parts per billion (ppb)).

29.     PFOA has the potential to be more of a health concern because it can stay in the environment and in the human body for long periods of time.

30.     Toxicology studies show that PFOA is readily absorbed after oral exposure and accumulates primarily in the serum, gallbladder, kidneys and liver.  PFOA has a half-life in the human body of 2 to 9 years.

31.     Studies in lab animals have found exposure to PFOA increases the risk of certain tumors of the liver, testicles, mammary glands, and pancreas in these animals.

32.     Studies in humans have found that people with workplace exposure to PFOA have higher risks of bladder and kidney cancer.

33.     The C8 Panel, connected with PFOA-related litigation in the Southern District of Ohio, determined that human exposure over 0.5 ppb (or 500 ppt) of PFOA for over one year is associated with increased risk of testicular cancer, kidney cancer, thyroid disease, high cholesterol, ulcerative colitis, and pregnancy-induced hypertension.  The medical experts who comprised the C8 Panel were approved by DuPont.  Indeed, in that litigation, DuPont has conceded the general causation question and admitted that PFOA causes these health ailments.

34.     At all relevant times, PFOA was an unregulated contaminant within the State of New York.

35.     New Jersey has established a preliminary health-based guidance value for PFOA exposure of 0.04 ppb (40 parts per trillion (ppt)); Vermont has established a health advisory level of 0.02 ppb (20 ppt).

36.     In 2009, the EPA issued a provisional health advisory for PFOA at 0.40 ppb.  The provisional health advisory states that the discovery of PFOA in water above the advisory level should result in the discontinued use of the water for drinking or cooking.

37.     The EPA issued a new provisional health advisory for PFOA on May 19, 2016, based on the agency's review of the best available peer-reviewed studies at the time.  In the new health advisory, the EPA established a lifetime limit of 70 ppt or 0.07 ppb for PFOA (and PFOS).

38.     The EPA noted that peer-reviewed studies indicate that "exposure to PFOA over certain levels may result in adverse health effects, including developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."

**PFOA Use in the McCaffrey Street Facility**

39.     The New York State Department of Health (DOH) has identified a factory at 14 McCaffrey Street in Hoosick Falls as a probable source for the presence of PFOA in the municipal water supply and local aquifer. According to a consent decree entered on June 3, 2016 between the New York State Department of Environmental Conservation (DEC), Saint-Gobain,

and Honeywell, the McCaffrey Street site is a "significant threat to public health or the environment."

40.     The facility on McCaffrey Street began operation in or about 1955, and Dodge Fiber owned and operated the factory at that time.

41.     Dodge Fiber sold the facility to Oak Industries in 1967, which in turn sold the facility to Allied-Signal in 1986.

42.     Allied-Signal sold the facility to Furon Company (Furon) in 1997, and, most recently, Saint-Gobain purchased the facility in or around 1999. Saint-Gobain remains the owner and operator of the McCaffrey facility.

43.     Upon information and belief, throughout the Oak Industries, Allied-Signal and Furon ownership of the McCaffrey facility, each company manufactured stain and water resistant fabric at the factory.

44.     Upon information and belief, Saint-Gobain continued to manufacture water and stain resistant fabric at the McCaffrey facility from its purchase of the factory until approximately 2004.

45.     Throughout this period, upon information and belief, each company utilized PFOA in the manufacturing of stain resistant fabric.

46.     In manufacturing this fabric, each company coated the fabric with a liquid solution containing PFOA (the "PFOA Solution") in order to make the fabric resistant to stain.

47.     Saint-Gobain, Furon and Allied-Signal utilized trays for the application of the PFOA Solution to the fabric.  Employees added the solution to the trays during production runs and recovered some or most of the solution at the end of the run each shift.

48.     Defendants' employees, however, at the direction of corporate officers, washed out and discharged the remaining PFOA Solution from the trays into drains during each shift on a daily basis.  Those floor drains resulted in the discharge of PFOA into the soil and, in turn, into the aquifer.

49.     On average, Saint-Gobain ran three shifts, five days a week at the McCaffrey facility.

50.     Upon information and belief, Saint-Gobain halted the use of PFOA at the McCaffrey facility around 2004.

51.     Upon information and belief, throughout the Oak Industries, Allied-Signal and Furon ownership of the McCaffrey facility, each company also used PFOA in a solid form as a part of a separate manufacturing process.

52.     Allied-Signal also made pressure-sensitive tapes, Teflon-coated fabrics, and Teflon sheet, tape and laminates while it owned the McCaffrey facility.

53.     Saint-Gobain also utilized PFOA in other processes at the McCaffrey facility between, upon information and belief, 1999 and approximately 2004.

54.     Generally, Saint-Gobain's 190-employee Hoosick Falls operation produces PTFE (polytetrafluoroethylene) film, adhesive tapes and silicone rubber for aeronautical, automotive, food processing and energy applications.

55.     Upon information and belief, Oak Industries, Allied-Signal, Furon and Saint-Gobain utilized six large, approximately three-story ovens as a part of their manufacturing process.  PFOA was used as part of the manufacturing process in advance of the use of the ovens and, accordingly, PFOA was baked in the ovens on a daily basis.

56.     Upon information and belief, the use of the ovens produced a sticky residue that would adhere to the internal tubing or "stacks" within the oven, and PFOA comprised a part of that residue.

57.     Upon information and belief, each company established a rotation by which each oven and its stacks were cleaned once every six weeks, with a different oven cleaned every Monday.

58.     Defendants' employees removed the residue in the stacks by washing the stacks in a large sink that measured approximately 3 feet by 3 feet by 20 feet in size.  At the end of each cleaning, the waste water from the cleaning was discharged down a drain and may have been released into a septic system or catch basin near the McCaffrey facility.  Those floor drains and other discharge points resulted in the discharge of PFOA into the soil and, in turn, into the aquifer.

59.     Defendants also discharged PFOA into the environment through other means that will be revealed through the discovery process.

60.     For example, the New York State Department of Environment Conservation (DEC), as part of the State's Superfund Program, has also opened investigations for a facility on John Street that was the Oak Materials Fluorglas Division ("John St. Site") and the Oak Materials Site on River Road ("Oak Materials Site").  Defendant Honeywell has entered into an Order on Consent and Administrative Settlement with the DEC.  That Order suggests that the John St. Site and the Oak Materials Site may have also contributed to or otherwise caused the PFOA contamination of the environment.

**Public Awareness and Disclosure of Contamination**

61.     The Village of Hoosick Falls (the "Village") has a population of approximately 3,500 individuals.

62.      The Village operates and maintains the municipal water system.

63.     The Village's municipal water system has approximately 1,300 service connections.  The Village estimates that its system provides water to nearly 95 percent of the Village's residents.

64.     The Village's municipal water system produced 147,227,010 gallons of water in 2014.

65.     In or around 2007, the Village completed the construction of a new production well to supply municipal water to many of the residents of Hoosick Falls.

66.     The production well lies approximately 500 yards away from the McCaffrey facility.

67.     Upon information and belief, prior to late 2014, the Hoosick Falls Water Department had not tested for the presence of PFOA within the municipal water.

68.     In June 2015, the Hoosick Falls Water Department conducted tests on the effluent from its production well(s) in order to discern whether PFOA existed within the water supply.

69.     Shortly thereafter, the Village received the results from its production well(s) tests.

70.     Those tests confirmed the presence of PFOA within the municipal water system.

71.     Testing of municipal water produced detections of 612 ppt (0.612 ppb), 618 ppt, 620 ppt, 151 ppt and 662 ppt for PFOA.

72.     Absent such testing, it  was not possible for plaintiff and other residents of Hoosick Falls to know that PFOA was and is in municipal water or private well water.  Thus, Village residents did not know and had no reason to know they were consuming hazardous levels of PFOA from their municipal water supply for years, if not decades.

73.     The Village oversaw the testing of certain private wells within the Village in the summer of 2015, and received results that included detections of 194 ppt, 246 ppt and 252 ppt..

74.     On November 25, 2015, the EPA contacted the Village and recommended the use of an alternative drinking water source and that residents not use municipal water for drinking and cooking.

75.     In early December 2015, the DOH released a fact sheet for the Village.  That fact sheet, in part, stated that "Health effects are not expected to occur from normal use of the water."

76.     The EPA repeated its recommendation to the Village on December 17.

77.     Shortly after this date, Saint-Gobain began providing free bottled water to citizens of Hoosick Falls.  Near this time, Saint-Gobain also agreed to fund the installation of a granulated activated carbon filter system on the municipal water system to remove PFOA from drinking water.

78.     On January 14, 2016, Healthy Hoosick Water, a local community group, sponsored a public meeting with personnel from the EPA, the DOH and New York State Department of Environmental Conservation (DEC).

79.     At that meeting, New York officials announced that New York State had submitted a letter that day seeking the designation of Hoosick Falls as a federal Superfund site. Officials anticipated that it would require the EPA six month to one year, at a minimum, before it would make a decision on the application.

11

80.     EPA officials acknowledged in that meeting that a Superfund designation would adversely impact the property values of the Village.

81.     The Hoosick Falls school district announced on January 22, that testing identified PFOA within its well water at its transportation center.

82.     Governor Cuomo directed state agencies on January 27, 2016, to use State Superfund money to address PFOA in the Hoosick Falls' municipal water system.  The State Health Commissioner said that the Saint-Gobain plant would be deemed a state Superfund site and designated it a Class 2 site.

83.     That same day, the governor announced an emergency regulation to classify PFOA a hazardous substance.

84.     The following day, the EPA advised that home owners with private wells should use bottled water if testing uncovered PFOA levels in their water at 0.1 ppb (100 ppt) or higher. The EPA further recommended that home owners with untested private wells use bottled water until testing was completed.

85.     In early 2016, one or more local banks indicated that they would not advance funds for a mortgage for the purchase or refinancing of a home in Hoosick Falls.  Indeed, the Treasurer of Trustco Bank, Kevin Timmons, publicly confirmed that the bank was not writing new mortgages for any home on the Village's municipal water supply.  Timmons indicated that lenders typically require that homes have access to potable water before financing is approved.

86.     Timmons further stated that financing would not be approved for homes on private wells until the water supply was tested for the presence of PFOAs and came back negative.

87.     The concern regarding lost property value prompted Governor Cuomo to dispatch representatives of the New York Department of Financial Services to begin regularly appearing in Hoosick Falls to answer residents' questions.  The president of the Hoosick Falls Credit Union observed that banks are within their right to suspend mortgage and refinancing applications where homes lack safe drinking water.  The president noted that there was not much the Department of Financial Services could do about the issue "other than listen."

88.     As a result of the presence of PFOA within the aquifer, the municipal water system and private wells, the property values within Hoosick Falls have experienced a significant decline.

89.     On or around February 1, 2016, New York Senator Chuck Schumer called on Defendant Saint-Gobain to disclose immediately the full extent of the pollution it caused. Senator Schumer stated, "Saint-Gobain did this.  They've got to first come clean as to what happened, where they put the stuff, and then work on a plan to quickly clean it up."

90.     The State of New York established a regular presence in Hoosick Falls beginning on February 1, 2016.  Under this approach, the State indicated that DOH personnel would be present in the Village three times a week to address concerns and to discuss how the State planned to move forward.

91.     The DEC wrote official letters to Saint-Gobain and Allied-Signal on February 11, 2016, and identified the two companies as parties potentially responsible for PFOA contamination at one or more properties in Hoosick Falls, including the Saint-Gobain McCaffrey Street Site, No. 442046.

92.     The DEC's letter to the two corporations constituted a demand that each enter into an enforceable Consent Order to characterize and investigate the extent of the contamination, to

13

provide interim remedial measures to protect public health and drinking water supplies, to analyze alternatives for providing clean and safe drinking water and, ultimately, to design and implement a comprehensive clean-up and remediation at the McCaffrey Street facility and any additional locations.

93.     The letter further advised each company that "responsible parties are liable for the reimbursement of funds expended by the State of New York in taking responsive actions at sites where hazardous substances and/or wastes have been released."

94.     Around the time these letters were sent, DEC commenced its investigation of PFOA contamination in Hoosick Falls.  On March 2, news media reported that the State was investigating at least 11 possible contaminated or illegal dumping sites in the Hoosick Falls area.

95.     On February 13, 2016, the DOH began offering free blood testing to residents of Hoosick Falls.  Although those results took several months to be disclosed, the results were alarming.  The state reports that residents of Hoosick Falls, on average, have at least eleven times higher levels of PFOA in their blood than the national average.

**Plaintiff's Exposure and Injuries**

96.     Mr. Donavan moved to Hoosick Falls in 1992.

97.     At that time, he moved into a house within the Village and utilized municipal water.

98.     Mr. Donavan utilized the water on a daily basis for cooking and drinking.  The home also possessed a hot tub, which he frequently used.  The Village provided the water to this house.

99.     During this time, he met his future wife Sue, who owned and operated the Falls Diner, located at 67 NY – 22, Hoosick Falls, NY.  From 1997 until 2014, Mr. Donavan ate meals at the diner on a daily basis and drank water from the tap.

100.    Falls Diner is on property adjacent to the Oak Materials Site.

101.    The diner, at all relevant times, possessed its own well, which it used for water.

102.    The diner's well tested positive for PFOA in 2015, and a filtration system was placed on the well.

103.    Mr. Donavan began to experience poor health in the mid-1990s.

104.    Initially, his immune system seemed to weaken and he experienced an increased number of colds.

105.    He suffered bouts of pneumonia in 1994, 1996 and 1999.

106.    In 2000, his doctor diagnosed Mr. Donavan with high cholesterol.

107.    Mr. Donavan was in his 40s at the time.

108.    Mr. Donavan's doctor prescribed medication for the high cholesterol and the medication was successful in lowering his cholesterol.

109.    Mr. Donavan's high cholesterol arises directly from and is caused by PFOA in the water that he has consumed, and defendants are directly responsible for the PFOA in the local aquifer and, accordingly, the drinking water.  The C8 Panel, referenced above, has linked high cholesterol with exposure to PFOA.

110.    Mr. Donavan's health changed dramatically for the worse in 2011.

111.    In that year, during a vacation, he began to experience bleeding.  That trip would prove to be the last time that Mr. Donavan would be able to take any vacation trips up to the present.

112.    Medical tests, including a colonoscopy, in November 2011, confirmed that Mr. Donavan had ulcerative colitis (colitis).

113.    As a result of the colitis, Mr. Donavan had to substantially change a number of habits, including placing substantial restrictions on what he could eat or drink.  Decaffeinated coffee and every day foods, such as raw fruits and raw vegetables would cause his colitis to flare up and, accordingly, had to be avoided.

114.    The colitis also forced Mr. Donavan to reduce the amount of time he spent on athletic activities.

115.    Mr. Donavan experienced consecutive weeks or months when he suffered bleeding and was required to make frequent trips to the bathroom, typically up to 20 trips per day.  The need for the use of a bathroom could be sudden and the colitis undermined aspects of direct muscle control.

116.    As a result, Mr. Donavan become largely housebound from the colitis, and avoided any long trips, particularly when the colitis flared up.

117.    His colitis forced Mr. Donavan to stop performing work on the properties that he owned in the Village and prevented him from working at the diner.

118.    Having colitis means that Mr. Donavan has a 30 percent chance of contracting cancer.

119.    Treatment of his colitis also resulted in a medical emergency.

120.    In February 2015, Mr. Donavan suffered a severe adverse reaction to his medication.  At that time, he experienced a steroid induced psychosis and began to develop severe paranoia.  The paranoia progressed to the point where he was essentially unable to move from his couch and he remained on the couch muttering incoherently.

121.   Mr. Donavan was hospitalized as a result of reaction to his medication and suffered physical and emotional harm as a result of the reaction.  Mr. Donavan experienced depression as a result of this attack for several months after the incident.

122.   Mr. Donavan's condition after this event was re-evaluated and elevated to moderately severe ulcerative colitis as his condition had worsened.

123.   His doctor has since changed his prescription and Mr. Donavan has not experienced a reoccurrence of this event.

124.   Mr. Donavan's colitis, however, continues to significantly hamper and restrict his daily activities and limit life's pleasures.

125.   Due to his colitis, Mr. Donavan will need to live with the limitations that colitis forces on him for the rest of his life.

126.   Mr. Donavan's colitis arises directly from and is caused by PFOA in the water that he has consumed and defendants are directly responsible for the PFOA in the local aquifer and, accordingly, the drinking water.

127.   But for the defendants' contamination of the local environment with PFOA, Mr. Donavan would not have high cholesterol and he would not be suffering from ulcerative colitis.

**Plaintiff's Property Interests**

128.   Mr. Donavan also owns a home within the Town of Hoosick Falls and the property is within walking distance of the McCaffrey plant and the Oak Material Site.

129.   Mr. Donavan's property utilizes a private well.

130.   Although a one-time test did not detect the presence of PFOA within his well water, DOH testing did discover the presence of PFOA in the well water of several neighbors.

131.    Mr. Donavan believes that the discovery of PFOA in the local aquifer and the declaration of the sites as State superfund sites have caused in the diminution of property values in the area, generally, and in a loss in value in the property that he owns.

132.    Mr. Donavan is also the president of a limited liability company that owns three properties in the Village of Hoosick Falls and another immediate across the river in the Town.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Negligence

133.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

134.    At the relevant times specified above, defendants owned and operated the various facilities in Hoosick Falls that utilized PFOA.

135.    This Claim is brought under New York law.

136.    Defendants knew or should have known that use of PFOA Solution and/or the disposal and discharge of PFOA Solution was potentially hazardous to human health and the environment and required Defendants to take adequate safety precautions to ensure that PFOA was not released into the surrounding environment.

137.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge filters or trays containing PFOA Solution onto the ground within floor drains in, and in close proximity to, the McCaffrey facility.

138.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge into the environment the residue from the manufacturing ovens and their stacks.

139.    Defendants had a duty to take all reasonable measures to ensure that PFOA Solution would be effectively contained and not discharged into the surrounding environment.

140.    Defendants further had a duty to ensure that the manufacturing processes they chose to employ did not unreasonably endanger the drinking water relied upon by residents of Hoosick Falls and the surrounding area.

141.    Defendants had a further duty, once the release of PFOA into the environment was discovered, to immediately and diligently investigate and address PFOA disposal methods in order to stop the release or spread of the contaminant.

142.    Defendants breached the above-stated duties by unreasonably disposing of PFOA Solution in a manner that guaranteed that PFOA would enter the environment, including the groundwater.

143.    As a result of Defendants' breach, the drinking water in and around Hoosick Falls, New York has become contaminated with unsafe levels of PFOA. Indeed, Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated both the municipal drinking water and drinking water of private wells in Hoosick Falls and the surrounding area.

144.    The consumption of PFOA-laced water has caused Mr. Donavan to develop both high cholesterol and ulcerative colitis.

145.   Further, Mr. Donavan's home, which he jointly owns with his wife, has experienced a significant decline in value due to the discovery of PFOA in the local aquifer and the designation of the local area as a State Superfund Site.

146.   Defendants' negligence was the proximate cause of all of the Plaintiff's injuries and damages.

147.   As a direct and proximate result of Defendants' actions and omissions described herein, Plaintiff has suffered and continues to suffer personal injury, specifically high cholesterol and ulcerative colitis, and the risk of further adverse health consequences (such as colon cancer). Mr. Donavan has also suffered a loss of value in his property.  Mr. Donavan's increased probability of colon cancer, along with other potential health issues, supports the adoption of a medical monitoring program as an additional remedy.

148.   Plaintiff seeks judgment against defendants in an amount that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction over all causes of action, nominal, compensatory and punitive damages in an amount to be determined by a jury but no less than $2,500,000, together with costs and disbursements of this action and interest from the date of verdict rendered thereon.

## SECOND CLAIM FOR RELIEF

### Gross Negligence

149.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

150.   Defendants' acts and omissions resulting in the massive release of PFOA into the environment demonstrate want of even scant care or an extreme departure from the ordinary

standard of care.  Defendant Honeywell may also be responsible for similar releases of PFOA from the Oak Materials Site.

151.    Defendants' failure to adequately manage, handle or oversee the disposal of its waste containing PFOA, and in particular to prevent a massive release of PFOA into the environment, and subsequent failure to contain that release, amounts to an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to others.

152.    Defendants knew or should have known that the haphazard and indiscriminate discharge of waste containing PFOA into the environment posed a threat of significant danger to the environment and to the health and well-being of the nearby community and residents of the Village of Hoosick Falls.

153.    Defendants' acts and omissions therefore demonstrate want of even scant care or an extreme departure from the ordinary standard of care, amounting to gross negligence.

154.    Defendants' gross negligence was the proximate cause of all of the Plaintiff's injuries and damages.

155.    Defendants are liable to Plaintiff for all damages arising from Defendants' wrongful conduct, including compensatory and exemplary relief.

156.    Plaintiff seeks judgment against defendants in an amount that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction over all causes of action, nominal, compensatory and punitive damages in an amount to be determined by a jury but no less than $2,500,000, together with costs and disbursements of this action and interest from the date of verdict rendered thereon.

## PRAYER FOR RELIEF

Plaintiff requests that the Court enter judgment in his favor and against Defendants, awarding as follows:

1.  Actual, general, special, incidental, statutory, compensatory, and consequential damages in an amount to be proven at trial, but no less than $2,500,000, including compensatory damages for:

    a.  The pain and suffering caused by the personal injuries detailed above;

    b.  Medical costs and expenses incurred in the personal injuries detailed above;

    c.  The costs of medical monitoring reasonably certain and medically necessary due to exposure to the PFOA;

    d.  Increased risk of future disease or illness;

    e.  Emotional distress and mental anguish;

    f.  Damages for loss or diminution in property value, and

    g.  Fear of Cancer.

2.  Punitive and exemplary damages due to Defendants' malice detailed above;

3.  All costs including reasonable attorneys' fees, court costs, and other litigation expenses;

4.  Pre and post-judgment interest

5.  All such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: July 27, 2016
      New York, New York

                                       Respectfully submitted,

                                       */s/ William A. Walsh*

                                       William A. Walsh (WW-3301)
                                       *wwalsh@weitzlux.com*
                                       Robin L. Greenwald (*pro hac vice* pending)
                                       *rgreenwald@weitzlux.com*
                                       James J. Bilsborrow
                                       *jbilsborrow@weitzlux.com*
                                       **WEITZ & LUXENBERG, P.C.**
                                       700 Broadway
                                       New York, New York 10003
                                       Telephone: (212) 558-5500
                                       Facsimile: (212) 344-5461

                                       *Attorneys for Plaintiff*